216

RAMONA RAMOS, Plaintiff and Appellee, *v.* THE MAYAGÜEZ SHIPPING TERMINAL, INC., Defendant and Appellant.

No. 7119. Argued February 5, 1937.—Decided November 3, 1937.

*J. Alemañy Sosa* for appellant. *Enrique Báez García* for appellee.

MR. JUSTICE HUTCHISON delivered the opinion of the Court.

Some eleven months before the accident which gave rise to the present action, defendant had built a bridge over a narrow inlet or channel near its pier. The bridge had been washed out by high water, the result of heavy rains, and an automobile in which plaintiff was riding while en route to the pier on a dark evening fell into the channel at the place where the bridge had been.

The first five assignments are that the district court erred: in finding that the bridge and the road leading to the pier were the exclusive property of defendant; in finding that the land purchased by defendant from Luisa Delgado was within the zone leased by the People of Puerto Rico; in finding that the road built on the land purchased from Luisa Delgado was the road which defendant was required to maintain throughout the leased zone as a means of communication with the waterfront; in finding that the participation of the mayor of Mayagüez, Juan Rullán, in the purchase by the defendant of the land from Luisa Delgado was merely "accidental" and unofficial, in compliance with a friendly request; in finding that the fact that the bridge and the road were open to public traffic did not create

any responsibility on the part of the People of Puerto Rico nor on the part of the municipality.

The lease was executed by the Commissioner of the Interior in connection with "An ordinance granting to Félix Benítez Rexach authority to construct, maintain and operate a public service pier, warehouses and all appurtenances thereto in the Harbor of Mayagüez, Porto Rico on that portion of the waterfront lying between 'La Puntilla' and 'Algarrobo' reef". The land described in the lease was a part of the strip known as the maritime zone. The seventh clause of the lease reads as follows:

"SEVENTH.—The lessee shall maintain in all the leased zone a gravelled road at least six meters wide, so as to establish communication with the littoral and the lessee can substitute this road with a marginal street which it may construct for the development of the piers, as long as the purpose of establishing a path through a public zone by the littoral is fulfilled."

In 1929 (410) the Legislature adopted a joint resolution "Directing the Commissioner of the Interior to construct a section of road joining Road No. 2 with Concordia Street of the Municipality of Mayagüez; appropriating funds for its construction, one-half of the expenses of which is to be met by private donations and by the municipality, and for other purposes." The Mayagüez Shipping Terminal then purchased a strip of land for a road which, branching off from the section authorized by the joint resolution, would lead to the site where the bridge was to be built. There was some testimony tending to show that while the section of road authorized by the joint resolution was being built, a spur or branch leading from that section to a point some five meters distant from the bridge site was also constructed under government supervision on a strip of land purchased by the Mayaguez Shipping Terminal from Luisa Delgado. The record does not show how the cost of constructing this branch was met.

The Mayagüez Shipping Terminal then built the bridge and the road between the bridge and the pier. By deviating from the road, contemplated by the lease at or near the point where the bridge was built, the Mayagüez Shipping Terminal eliminated a sharp and dangerous curve. Apparently the bridge and the section of road which connected it with the other section of road authorized by the joint resolution were substituted for a part of the road which the Mayagüez Shipping Terminal was required to construct and maintain over that part of the maritime zone described in the lease. Obviously this abandonment of a part of the route contemplated in the lease and the substitution of the new road was with the tacit consent and approval of the commissioner of the interior who supervised the construction of that portion of the road which led from a point near the bridge to the section authorized by the joint resolution. Whether the cost of constructing this part of the road was paid by the Mayagüez Shipping Terminal or not, the road was built on land purchased for that purpose by the Mayagüez Shipping Terminal to be used in connection with the bridge and with the road between the bridge and the pier primarily as a means of ingress and egress and as a connecting link between the pier and the down-town business district of Mayagüez. Although this road was opened to the public it did not lose its character as an indispensable adjunct of the business upon which the Mayagüez Shipping Terminal was to depend for its financial success as a public service corporation.

It seems that long before the building of the pier one Bravo opened a road which crossed the channel at another place by means of a wooden bridge and traversed the properties of Luisa Delgado and José Romaguera. Sometime before the pier was built Romaguera sold to the Shell Oil Co. a parcel of land on condition that the vendee would built another road around or alongside the property so acquired to be used instead of that part of the old road through the Romaguera property. This the Shell Oil Co. did. The man-

ager of the Mayaguez Shipping Terminal testified that its land extended to the boundary line of the Romaguera property and of the Shell, that is to say, to the northern boundary line of the Shell property. After the destruction of the bridge built by the Mayagüez Shipping Terminal, the old wooden bridge was repaired and strengthened under the supervision of the Mayagüez Shipping Terminal with money contributed by it, by the Shell, by Romaguera and by the Mayagüez Light & Ice Co. Before this was done, the Mayagüez Shipping Terminal, in order to reopen the old road, obtained permission from Luisa Delgado to remove a wire fence which she had placed accross it shortly after the building of the new bridge by the Mayagüez Shipping Terminal. Romaguera testified that the road built by the Shell Oil Co. was on the maritime zone. There was testimony tending to show that one end of the bridge built by the Mayagüez Shipping Terminal rested on a part of the road built by the Shell Oil Company, or as one witness put it, on the end of that road. Romaguera testified that "a corner" of the road was damaged or destroyed when the bridge was washed out. From the record before us it is impossible for one not acquainted with the locality to visualize the relative location of the pier, of the two bridges, of the road constructed by the Shell Oil Co. and of defendant's leasehold interest in the maritime zone. The district judge was in a better position than this Court now is to weigh the evidence as a whole.

A resident engineer, in charge of all the insular roads and bridges in the district of Mayagüez, testified that the bridge built by the Mayagüez Shipping Terminal had never been in his custody or under his supervision and control. His testimony concerning the control and supervision of the section of road between a point near the bridge and the section authorized by the joint resolution, is not so clear. He does say however, that after the disappearance of the bridge, he placed no danger signal or warning to the public at that point because he had nothing to do with the bridge. He

was equally positive that he had exercised no supervision or control over any part of the road between the bridge and the pier. There is no satisfactory basis for a conclusion that either the bridge built by the Mayagüez Shipping Terminal some ten or eleven months before the destruction thereof or the section of road built by the Shell Oil Co. on the maritime zone primarily for its own use and that of its vendor, Romaguera, had passed from the ownership, supervision and control of the builders, by dedication or otherwise, to the ownership, supervision and control of the insular government or to the ownership, supervision and control of the municipality of Mayagüez. Whether or not the land purchased by the Mayagüez Shipping Terminal from Luisa Delgado was within that part of the maritime zone held by the Mayagüez Shipping Terminal under lease from the People of Puerto Rico, whether or not the road built upon the land purchased from Luisa Delgado was the road not less than six meters in width which defendant was required to maintain throughout the leased zone as a means of communication with the water-front, whether or not the action of the mayor in facilitating the purchase of the land from Luisa Delgado was merely ''accidental'' and unofficial, and whether or not the public use of the road between a point within five meters of the bridge and the section of road authorized by the legislative joint resolution of 1929, created any responsibility on the part of the People of Puerto Rico or on the part of the municipality, were not pivotal points. The accident did not occur on any part of the road last mentioned. As to the public use of the bridge, the question was not so much whether such use created any liability on the part of the insular government or on the part of the municipality as it was whether such use relieved defendant of responsibility for the accident.

▮ Other assignments are that the district court erred: in holding that the doctrine of dedication is inapplicable in this Island, that the only municipal roads are those which

have been opened in accordance with the provisions of the Municipal Law, and that the only insular roads are those which have been incorporated by legislative action into the general system established by the Road Law, approved March 8, 1906; in not finding that the accident was due to the negligence of plaintiff and of the driver of the automobile; in finding that the testimony of Dr. Frank O. Rivera, corroborated plaintiff's testimony; in rendering judgment for plaintiff for the full amount claimed, and in awarding costs to plaintiff.

In view of the conclusions already reached, we need not now determine the extent to which the doctrine of dedication is applicable in this jurisdiction. The evidence failed to establish contributory negligence on the part of plaintiff or on the part of the driver. The testimony of Dr. Rivera corroborated, in part at least, the testimony of plaintiff. We find no satisfactory basis for a modification of the judgment as to the amount thereof and no abuse of discretion in the award of costs.

The judgment appealed from must be affirmed.

Mr. Justice Wolf and Mr. Justice Córdova Dávila took no part in the decision of this case.